UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

STEVEN QUEEN,                     :        Case No. 1:12-cv-193
                                  :
        Plaintiff,                :        Judge Timothy S. Black
                                  :
vs.                               :
                                  :
COMMISSIONER OF                   :
SOCIAL SECURITY,                  :
                                  :
        Defendant.                :

**ORDER THAT: (1) THE ALJ'S NON-DISABILITY FINDING IS FOUND
SUPPORTED BY SUBSTANTIAL EVIDENCE, AND AFFIRMED;
AND (2) THIS CASE IS CLOSED**

This is a Social Security disability benefits appeal.  At issue is whether the

administrative law judge ("ALJ") erred in finding the Plaintiff "not disabled" and

therefore unentitled to supplemental security income ("SSI").  (*See* Administrative

Transcript ("Tr.") (Tr. 14-24) (ALJ's decision)).

**I.**

Plaintiff applied for SSI in May 2008, alleging that his disability began in January

1988.  (Tr. 139).  Plaintiff previously received SSI, but the benefits were terminated in

2007 upon his incarceration.  (Tr. 153, 996).[1]  Plaintiff alleged disability due to bulging

disk, lower back pain, depression and bipolar disorder.  (Tr. 987, 993, 1004-06).

Plaintiff's application was denied initially and upon reconsideration.  (Tr. 70-72, 77-79).

---

[1] The administrative record also contains a March 2007 application for SSI that Queen
apparently filed while incarcerated for theft.  (Tr. 99-101, 149-151).

Plaintiff went before an ALJ at a hearing in June 2010 and testified in the presence of his attorney.  (Tr. 975).  The ALJ found that although Plaintiff had severe impairments, he retained the functional capacity to perform a range of medium work and a significant number of jobs in the national economy and thus was not disabled.  (Tr. 23).

The Appeals Council denied review (Tr. 305), making the ALJ's determination the Commissioner's final decision for purposes of judicial review.  Plaintiff then commenced this action in federal court pursuant to 42 U.S.C. § 405(g), for review of the Commissioner's final decision.

At the time of Plaintiff's alleged onset date he was 45 years old.  Plaintiff completed the ninth grade and had difficult reading, writing, and spelling.  (Tr. 980-81).  Plaintiff testified at the hearing that he had not worked since 1988 because he was "really nervous" around people and broke his neck in a car accident in 2008.  (Tr. 984).  Plaintiff's past relevant work included work as a cashier, fast food worker, and a mail clerk.  (Tr. 18, 47).  Plaintiff lives in a rented trailer with his son who receives SSI and food stamps.  (Tr. 18).

The ALJ's "Findings," which represent the rationale of his decision, were as follows:

1. The claimant has not engaged in substantial gainful activity since May 15, 2008, the application date (20 CFR 416.971 *et seq.*).

2. The claimant has the following severe impairments: C5 degenerative changed; status-post C5-6 fusion; lumbar and thoracic degenerative changes; personality disorder; and affective disorder (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 416.967(c).  Specifically, he can perform the requirements of work activity except as follows:  He can lift/carry up to 50 pounds occasionally and 25 pounds frequently, and stand, walk and/or sit for six hours in an eight-hour workday.  He can only occasionally stoop, kneel, crouch, crawl, and climb ramps and stairs.  He should not climb ladders, ropes, or scaffolds or work at unprotected heights.  Mentally, he is able to perform only simple, routine, repetitive tasks, and remember and carry out only short and simple instructions.  He cannot interact with the general public, and cannot interact with coworkers or supervisors more than occasionally.  His contact with others should be no more than brief and superficial.  His job should not require more than ordinary and routine changes in work setting or duties.  He is able to make only simple work-related decisions.  In addition, his job should not require more than simple reading, writing, or simple math.

5. 'The claimant has no past relevant work (20 CFR 416.965).

6. The claimant was born on May 30, 1965 and was 42 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7. The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, since May 15, 2008, the date the application was filed (20 CFR 416.920(g)).

(Tr. 16-23).

In sum, the ALJ concluded that Plaintiff was not under a disability as defined by the Social Security Regulations, and was therefore not entitled to SSI.  (Tr. 24).

On appeal, Plaintiff argues that: (1) the ALJ erred in failing to consider all of claimant's serious impairments in reaching the limited medium residual functional capacity assessment contained in the decision; (2) the ALJ failed to properly assess the credibility of the claimant's testimony at the hearing, regarding chronic pain and non-exertional limitations; and (3) the ALJ abused his discretion in failing to order a medical physical examination.  The Court will address each error in turn.

## II.

The Court's inquiry on appeal is to determine whether the ALJ's non-disability finding is supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales,* 402 U.S. 389, 401 (1971).  In performing this review, the Court considers the record as a whole.  *Hephner v. Mathews,* 574 F.2d 359, 362 (6th Cir. 1978).  If substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if substantial evidence also exists in the record upon which the ALJ could have found plaintiff disabled.  As the Sixth Circuit has explained:

> "The Commissioner's findings are not subject to reversal
> merely because substantial evidence exists in the record to
> support a different conclusion.  The substantial evidence
> standard presupposes that there is a "zone of choice" within
> which the Commissioner may proceed without interference
> from the courts.  If the Commissioner's decision is
> supported by substantial evidence, a reviewing court must
> affirm."

*Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).

The claimant bears the ultimate burden to prove by sufficient evidence that he is entitled to disability benefits.  20 C.F.R. § 404.1512(a).  That is, he must present sufficient evidence to show that, during the relevant time period, he suffered an impairment, or combination of impairments, expected to last at least twelve months, that left him unable to perform any job in the national economy.  42 U.S.C. § 423(d)(1)(A).

## A.

The record reflects that:

### 1. *Vocational Evidence and Testimony at the Administrative Hearing*

Plaintiff estimated that he could lift five pounds and stand for two to three minutes.  (Tr. 991, 994).  He also explained that he had depression and bipolar disorder and attempted suicide several times.  Plaintiff also described difficulty concentrating and interacting with others.  (Tr. 1004–06).

A vocational expert testified that a hypothetical individual of the same age, education, and background as Plaintiff who could perform a range of medium work that required only simple, routine, repetitive tasks with short and simple instructions, with no

5

interaction with the general public, occasional interaction with coworkers and supervisors, brief and superficial contact with others, no more than ordinary and routine changes in a work setting or duties, and simple reading, writing, and math could work as a hand packager, stock clerk, and inspector.  (Tr. 1019–20).

### 2.  *Mental Impairments*

Hong Kang, M.D., Plaintiff's psychiatrist, treated his anxiety and impulse control disorders from May 1999 to April 2003.  (Tr. 323–33, 728–44).  Plaintiff consistently reported that he felt better with medication.  (Tr. 323–33, 728–44).  Dr. Kang adjusted the medication when Plaintiff felt agitated, and during their last appointment in April 2003, Plaintiff appeared brighter and calmer, and his judgment and insight were unimpaired.  (Tr. 328–29, 331, 333, 733–34, 737–39).

In June 2003, Alisa Williams, a licensed social worker, assessed Plaintiff.  (Tr. 602).  Plaintiff complained of severe depression, anxiety, irritability, difficulty sleeping, and suicidal thoughts, particularly since his wife left him.  (*Id.*)  He also reported hearing voices telling him to harm himself.  (Tr. 604).  Ms. Williams diagnosed him with depressive disorder.  (*Id.*)

In August 2003, psychiatrist Cheri Lindberg examined Plaintiff, who reported trouble controlling his temper, difficulty with his nerves, problems with authority, and chronic suicidal ideation.  (Tr. 599).  Dr. Lindberg noted that it was "difficult to find out what his actual symptoms are, as he has used substances intermittently throughout his life," and thus she was "not able to tell if he has an actual depressive disorder."  (*Id.*)

Nonetheless, she diagnosed Plaintiff with borderline personality disorder, provisional, and personality disorder, nonspecified. (Tr. 601).

On July 3, 2009, a psychological evaluation was performd by Dr. Heiskell. On the Wechsler Adult Intelligence Scale-III (WAIS-III) test, Plaintiff obtained a verbal IQ score of 55, performance IQ score of 56, and full-scale IQ score of 51, which placed him in the mildly retarded range. (Tr. 20). However, Dr. Heiskell determined that the score did not appear to be valid due to Plaintiff's malingering. (Tr. 21).

In February 2009, Plaintiff reported to Shawnee Mental Health Center that he felt depressed and nervous and was hearing voices after not taking his medicine for two months. (Tr. 597).

On October 30, 2009, Dr. Carver, a clinical psychologist, saw Plaintiff after being referred by Scioto County Department of Job and Family Services. Dr. Carver noted that Plaintiff had applied for medical assistance and an evaluation was necessary to identify mental issues that would require treatment or create a vocational disability. Plaintiff presented himself with multiple psychiatric symptoms. Specifically, his behavior and conversation was highly dramatic "if not theatrical" and Dr. Carver opined that Plaintiff was exaggerating. (Tr. 21).

Plaintiff saw psychiatrist Jojo Variath in February 2010 and complained of changes in mood, poor sleep, and anxiety. (Tr. 767). Dr. Variath noted that Queen had "a long history of psychiatric problems with past substances but none at this time." (*Id.*) The doctor prescribed medication for Plaintiff's anxiety and sleep issues. (*Id.*)

Plaintiff met with Angie McPheters, a licensed social worker, several times between February and June 2010. During the first appointment Plaintiff appeared agitated and irritable and reported hearing voices daily. (Tr. 762–63). He also indicated that he "[did] not want to work." (Tr. 762). Ms. McPheters diagnosed him with bipolar I disorder, most recent episode manic, and antisocial personality disorder, and assigned a Global Assessment of Functioning (GAF) score of 30.[2] (Tr. 765). Plaintiff returned the next month and reported anxiety and agitation. (Tr. 949). Ms. McPheters noted that he was polite and less tense and that the medication seemed to be beneficial. (Tr. 949). In May, Plaintiff was depressed and tearful after his brother died but expressed his emotions appropriately and was not tense or angry. (Tr. 947). He was calmer and less anxious in June and was "coping well" since the death of his brother. (Tr. 946).

Plaintiff met with Patricia Sparks, MSN, CNP, in April 2010 to evaluate the symptoms of his bipolar disorder and the effectiveness of his medication. (Tr. 948). He denied problems and reported no symptoms. (*Id.*)

### 3. *Physical Impairments*

Plaintiff underwent a spinal fusion at the C5-C6 level, but x-rays taken in January and December 2002 were unremarkable. (Tr. 890, 895). A December 2004 x-ray of his spine showed degenerative disease but no acute abnormalities (Tr 886), and a CT scan of

---

[2] The Global Assessment of Functioning ("GAF") is a numeric scale (0 through 100) used by mental health clinicians and physicians to rate subjectively the social, occupational, and psychological functioning of adults, *e.g.*, how well or adaptively one is meeting various problems-in-living. A score of 21-30 indicates behavior is considerably influenced by delusions or hallucinations or serious impairment in communication (*e.g.*, largely incoherent or mute).

his neck in September 2005 showed the spinal fusion with adjacent degenerative spondylosis but otherwise was normal. (Tr. 668). An x-ray of Plaintiff's back in October 2007 showed mild degenerative disc disease but no acute traumatic abnormalities. (Tr. 357).

In June 2008, Plaintiff injured his back and neck in a car accident. (Tr. 388). He was alert and oriented upon arrival at the hospital and had full muscle strength in his arms and legs and no sensory deficits. (Tr. 388–90). An x-ray taken days before the accident showed degenerative changes in Plaintiff's neck, straightening of the cervical spine, and a stable surgical fusion at C5-C6 (Tr. 667), and a CT scan after the accident showed reactive, sclerotic degenerative changes of the spine but no evidence of injury (Tr. 426). Plaintiff's head, neck, and chest were normal. (Tr. 426). After Plaintiff's release from the hospital, he reported back pain at Southern Ohio Medical Center and requested narcotics. (Tr. 455). He left without treatment when the doctor, noting "drug seeking behavior," refused to treat him with narcotics. (Tr. 455–56). Plaintiff went to the emergency room complaining of back pain the next month. (Tr. 450). He had decreased range of motion in his lumbar spine and was prescribed pain medication. (Tr. 451, 453).

Chiropractor G. Marvin Staker wrote a note in August 2008 opining that Plaintiff had a bulging disc at L5-S1 and C6-C7. (Tr. 487).

In October 2008, Plaintiff complained of arthritis pain and back problems in the emergency room, but an examination was normal. (Tr. 867–68).

In September 2009, Plaintiff went to the emergency room after he jumped from his moving car when he heard voices instruct him. (Tr. 675). He complained of back and neck pain, but CT scans of his lumbar and cervical spine were normal. (Tr. 671). Plaintiff was given pain medication and discharged later that day. (Tr. 674, 677).

A December 2009 MRI of Plaintiff's lumbar spine showed mild neural foraminal narrowing at L5-S1, right and left, in relation to a broad disk displacement/shallow disk protrusion and fact joint changes; no canal stenosis; and a multifactorial trefoil appearance to the canal at L4-L5. (Tr. 707). A February 2010 CT scan of Plaintiff's cervical spine showed degenerative changes, and a CT scan the next month showed discogenic disease at the L5-S1 but no acute abnormalities in the thoracic, lumbar, or cervical spine. (Tr. 804, 806, 853).

Plaintiff reported back pain in the emergency room in April 2010, but an examination showed full range of motion and no tenderness. (Tr. 866).

Dr. Thompson began treating Plaintiff's back and neck pain in April 2010. (Tr. 954). Plaintiff described pain since his May 2008 car accident, but was in no apparent distress during the appointment. (*Id*.) He had tenderness to his lumbar paraspinals but full functional range of motion and full strength in his arms and legs and full range of motion in his cervical and lumbar spine. (*Id.*) Plaintiff's gait was antalgic but within functional limits. (Tr. 954–55). Dr. Thompson diagnosed him with chronic pain syndrome and depression and began an opiate regimen and prescribed Cymbalta. (Tr. 955). Plaintiff returned in May and reported pain in his spine. (Tr. 952). He reported

10

that Cymbalta relieved his depression but that he felt more angry and decided to stop taking the medicine. (*Id*.) He walked with an antalgic gait and had tenderness throughout the paraspinal region and decreased range of motion. (*Id*.) Dr. Thompson reviewed the December 2009 MRI of his lumbar spine and prescribed a cane. (Tr. 902, 952). In June, Plaintiff reported a 20% improvement in his pain. (Tr. 951). He walked with an antalgic gait but arose from a seated position in a much smoother manner. (*Id*.) Dr. Thompson increased his pain medication and noted that the medicine had "significantly improved his condition" and "allow[ed] him to perform his activities of daily living." (*Id*.) Dr. Thompson also increased the dosage of Plaintiff's anxiety medication. (*Id*.)

### 2. Opinion from Treating Physician

Allen Tucker, M.D., Plaintiff's primary care doctor, began treating him in July 2008 and wrote a note in August 2008 stating that he was "medically unable to work at this time." (Tr. 488). Dr. Tucker reported in September 2008 that Plaintiff had edema in his neck, low back pain upon straight leg raising, multiple lacerations on his arms and legs, but a normal gait and no clinical abnormalities and/or gross anatomical deformities. (Tr. 489). He also prepared a note in April 2009 reporting that Plaintiff was "temporary [sic] totally disabled and cannot work." (Tr. 611).

### 3. Opinions From Examining Physicians

Thomas Heiskell, Ph.D., examined Plaintiff in July 2008. (Tr. 442). Plaintiff reported that he could not return to work because he heard voices and felt anxious around

11

others, but Dr. Heiskell emphasized that Plaintiff consistently denied hallucinations and
suicidal thoughts throughout treatment with Dr. Kang.  (Tr. 442–43).  Plaintiff's affect
was moderately anxious, and Dr. Heiskell noted that "some of that appeared associated
with efforts related to impression management."  (Tr. 444).  Dr. Heiskell described him
as "often resistant or evasive" when asked to provide specific examples of his reported
problems.  (*Id.*)  He noted that it was difficult to assess Plaintiff's level of insight and
judgment based on the validity concerns.  (Tr. 446).  Dr. Heiskell administered the
WAIS-III, and Plaintiff's results fell in the mildly retarded range, but the doctor
noted that the score did not appear valid in light of Plaintiff's "numerous questionably
valid responses."  (Tr. 446–47).  Dr. Heiskell opined that Plaintiff had borderline
intellectual functioning and a personality disorder and assigned a symptomatic GAF
score of 65 and daily functioning GAF score of 50.[3]  (Tr. 447).  Dr. Heiskell concluded
that Plaintiff's ability to understand and follow instructions might be mildly limited,
consistent with a clinical impression of borderline intellectual functioning; his ability to
maintain attention to perform simple, repetitive tasks did not appear to be impaired; his
ability to relate to others was moderately limited; and his ability to withstand the stress
and pressures of work was mildly limited.  (Tr. 448).

---

[3]  A score of 41-50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals,
frequent shoplifting) OR any serious impairment in social, occupational, or school functioning
(*e.g.*, no friends, unable to keep a job).  A score of 61-70 indicates some mild symptoms (*e.g.*,
depressed mood and mild insomnia) OR some difficulty in social, occupational, or school
functioning (*e.g.*, occasional truancy, or theft within the household), but generally functioning
pretty well, has some meaningful interpersonal relationships.

Dr. Heiskell reexamined Plaintiff in November 2008. (Tr. 532). Plaintiff "related in a persistently dramatizing, irritable fashion," displayed no thought process difficulty, and his speech was consistent with borderline verbal intellectual functioning. (Tr. 534). Plaintiff again reported that he heard voices, but his girlfriend, who described him as nervous and easily agitated, did not report witnessing hallucinatory activity. (Tr. 532–35). Dr. Heiskell again administered the WAIS-III, and Plaintiff's scores fell in the lower mildly retarded range, but the results were invalid in light of his "apparent premorbid functioning." (Tr. 535). Dr. Heiskell opined that Plaintiff had depressive disorder and personality disorder but was malingering. (Tr. 536). He assigned a symptomatic GAF score of 50 and daily functioning GAF score of 53.[4] (*Id*.) Dr. Heiskell concluded that Plaintiff's ability to understand and follow instructions again was not validly presented; his ability to maintain attention to perform simple, repetitive tasks was not impaired; his ability to relate to others was markedly impaired; and his ability to withstand the stress and pressures of work was moderately limited. (Tr. 537).

In November 2009, Joseph Carter, Ph.D., examined Plaintiff, who displayed "multiple psychiatric and medical symptoms" but was "highly dramatic if not theatrical" (Tr. 694). Plaintiff was highly agitated and offered "spoiled or uncooperative" responses, and Dr. Carter opined that his exaggerated and self-dramatizing display may be normal in light of his psychiatric status. (Tr. 697–98). Dr. Carver diagnosed Plaintiff with

---

[4] A score of 51-60 indicates moderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (*e.g*., few friends, conflicts with peers or co-workers).

dysthymia, generalized anxiety disorder, and assigned a GAF score of 35.[5]  (Tr. 699).  He

concluded that Plaintiff was incapable of gainful employment.  (Tr. 700).

### D. Opinions From Reviewing Physician and Psychologists

Guy Melvin, Ph.D., reviewed the medical record in May 2007, but concluded that

there was insufficient evidence to evaluate Plaintiff's present mental functioning.  (Tr.

747).

Aracelis Rivera, Psy.D., reviewed the record in July 2008 and concluded that

Plaintiff could perform simple repetitive tasks and some detailed tasks in a setting where

his interpersonal exchanges were brief and superficial.  (Tr. 472).  Rivera considered

Plaintiff's borderline intellectual functioning disorder and personality disorder and

concluded that he had mild restrictions of activities of daily living, moderate limitations

in maintaining social functioning and concentration, persistence, or pace, and had

experienced no episodes of decompensation.  (Tr. 483).  Vicki Casterline, Ph.D., affirmed

this assessment in November 2008.  (Tr. 539).

Paul Morton, M.D., reviewed the medical evidence relating to Plaintiff's car

accident in December 2008 and found no evidence of any medical problem of lasting

severity.  (Tr. 589).

---

[5]  A score of 31-40 indicates some impairment in reality testing or communication (*e.g*., speech
is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work
or school, family relations, judgment, thinking, or mood (*e.g*., depressed adult avoids friends,
neglects family, and is unable to work).

### *5. Opinion from Medical Expert*

L.T. Foreman, Ph.D., a clinical psychologist, testified as a medical expert at the administrative hearing.  Dr. Foreman, who reviewed the medical record and listened to Plaintiff's testimony, opined that he had borderline disorder with antisocial and borderline features.  (Tr. 1007–08).  The doctor explained that, in light of the reports from Plaintiff's psychologists noting that he was malingering, exaggerating, and using alcohol and legal drugs, Plaintiff was not credible.  (Tr. 1009).  Dr. Foreman also emphasized that Dr. Kang, Plaintiff's former psychiatrist, noted that his symptoms improved with medication but that he was not compliant.  (Tr. 1010).  He discounted consultative psychologist Dr. Carver's opinion that Plaintiff could not work because Dr. Carver also found that Plaintiff was exaggerating.  (Tr. 1011).  Dr. Foreman ultimately concluded that Plaintiff could perform work involving one-and-two-step tasks and brief and superficial contact with others.  (*Id*.)

### *6. Vocational Expert*

The vocational expert testified that given all of the factors, Plaintiff would be able to work as a hand packager (133 jobs in regional economy); stock clerk (234 jobs in the regional economy), and inspector (63 jobs in the regional economy).  (Tr. 23).

### B.

First, Plaintiff alleges that the ALJ did not consider all of his serious impairments in reaching the limited medium residual functional capacity assessment.  Specifically,

Plaintiff claims that the RFC did not take into account his rheumatoid arthritis and hepatitis C. The Court will also consider Plaintiff's argument that the ALJ abused his discretion in failing to order a consultative physical examination.

Plaintiff does not provide any medical evidence to suggest that his hepatitis C or arthritis were disabling. Therefore, the ALJ could not consider such conditions when assessing the RFC. *See, e.g.,* SSR 96-8p (when no allegation of restriction of a specific functional capacity and no information in case record that there is such restriction, adjudicator must consider claimant to have no restriction with respect to that functional capacity); *Greeno v. Apfel*, 2 F. App'x 536, 541 (7th Cir. 2001) ("Although the ALJ did not specifically address [claimant's] hepatitis, the record includes no medical information about how that disease affects [claimant's] functioning").

Plaintiff also contends that the ALJ's RFC assessment is inconsistent with the April 2009 opinion of Dr. Tucker and a December 2004 x-ray of his spine. However, the April 2009 opinion is a one-sentence note that was faxed to Plaintiff's attorney which states simply that "[t]he above patient is temporary [*sic*] totally disabled and cannot work." (Tr. 611). However, the determination of disability is reserved to the Commissioner, and the ALJ appropriately concluded that the declaration that claimant "cannot work" lacked the detail required to give the opinion significant weight. *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) ("[T]he ALJ is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective

criteria and documentation").[6]

Next, Plaintiff argues that the ALJ's RFC assessment cannot stand because no medical source found that he could perform medium work.  While a medical source may provide an opinion about what a claimant can do despite his impairments, that opinion is just one factor an ALJ may consider when determining an individual's RFC.  *Steadman v. Astrue*, No. 1:10cv801, 2011 U.S. Dist. LEXIS 148575, at *9 (S.D. Ohio Dec. 21, 2011) (rejecting notion that "ALJ was required to obtain a medical source opinion in developing [claimant's] physical RFC").  Neither was the ALJ obligated, as Plaintiff suggests, to order a consultative examination.

An ALJ should order a consultative examination only when the evidence received is inadequate to determine whether the claimant was disabled.  20 C.F.R. § 416.917.  The ALJ detailed Plaintiff's medical history, but found that the medical evidence revealed no abnormalities.  (Tr. 19-20, 390, 804).  *See, e.g., Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) ("The regulations do not require an ALJ to refer a claimant to a consultative specialist, but simply grant him the authority to do so if the existing medical sources do not contain sufficient evidence to make a determination).  The ALJ is responsible for ensuring that each claimant receives a "full and fair hearing" and for fully developing the record.  *Lashley v. Sec'y Health & Human Services*, 708

---

[6]  *See also Littlepage v. Chater*, No. 96-6618, 1998 U.S. App. LEXIS 688, at *2-3 (6th Cir. Jan. 14, 1998) (ruling that the ALJ was not obligated to recontact the treating physician even though the  doctor's office visit notes did not comport with the level of functioning he indicated in his Medical Assessment form; instead, the ALJ was free to resolve the conflict by discounting the doctor's findings, which were unsupported by objective medical evidence, and "rely[] instead upon the [d]octor's actual treatment notes").

F.2d 1048, 1051 (6th Cir. 1983). However, the ALJ's duty to develop the record is

balanced with the fact that "[t]he burden of providing a complete record, defined as

evidence complete and detailed enough to enable the secretary to make a disability

determination, rests with the claimant." 20 C.F.R. § 416.912. Although the ALJ is

required to conduct a "full inquiry" into the issues before rendering a decision, the ALJ is

not required to order additional evidence, such as a consultative examination, unless

doing so "is necessary for the ALJ to render a disability decision." *Landsaw*, 803 F.2d at

214.[7] Therefore, the ALJ was not obligated to seek a consultative examination in order to

determine Plaintiff's RFC given the significant evidence in the record. There was

sufficient evidence in the record regarding Plaintiff's impairments for the ALJ to

determine the limitations imposed by those impairments.

Next, Plaintiff argues that the ALJ should have considered whether the

combination of his impairments equaled the criteria for "Listing Section 1.00."[8] The ALJ

---

[7] 20 C.F.R. § 404.1519a(b) states: "Situations requiring a consultative examination. A consultative examination may be purchased when the evidence as a whole, both medical and nonmedical, is not sufficient to support a decision on your claim. Other situations, including but not limited to the situations listed below, will normally require a consultative examination: (1) The additional evidence needed is not contained in the records of your medical sources; (2) The evidence that may have been available from your treating or other medical sources cannot be obtained for reasons beyond your control, such as death or noncooperation of a medical source; (3) Highly technical or specialized medical evidence that we need is not available from your treating or other medical sources; (4) A conflict, inconsistency, ambiguity or insufficiency in the evidence must be resolved, as we are unable to do so by recontacting your medical source; or (5) There is an indication of a change in your condition that is likely to affect your ability to work, but the current severity of your impairment is not established." None of these situations apply to the instant case.

[8] Listing 1.00 refers to the introductory portion of the listing disorders of the musculoskeletal system. It is not, by itself, a listed impairment.

18

reasonably concluded that Plaintiff's physical impairments did not meet or equal the criteria of any listed impairment, in particular Listing 1.04, disorders of the spine, because the evidence did not show nerve root compression and limited range of motion. (Tr. 17).  Plaintiff failed to identify alternate medical findings related to his impairments that are at least of equal medical significance to the required criteria for any listed impairment, and thus his lay assertion, that he equaled any listing, is rejected.  20 C.F.R. § 416.926; *McDonald v. Astrue*, No. 1:09cv860, 2011 U.S. Dist. LEXIS 20698, at *7 (S.D. Ohio Jan. 10, 2011) ("ALJ's finding that [the claimant's] combination of impairments did not meet or equal the Listings is sufficient to show that the ALJ has considered the effect of the combination of impairments").

Accordingly, the proof of disability is strong and opposing evidence is lacking in substance.  There is no indication that the ALJ failed to properly consider Plaintiff's impairments or abused his discretion in declining to order a consultative exam.

## C.

Next, Plaintiff alleges that the ALJ failed to properly assess his credibility regarding chronic pain and non-exertional limitations.

Plaintiff argues that the ALJ's conclusion that he was not fully credible is inconsistent with Dr. Foreman's testimony that the record supported his statements "as to the mental limitations, the hallucinations."  (Tr. 1012).  The testimony clarifies the issue:

> Q. [ALJ] In other words – well, let me rephrase it.  Does the record support his testimony regarding – if you accept his testimony, he would likely be unable to work.  I'm just talking about his mental impairments, not his physical.  To what

19

– does the record support those?

A. [Dr. Foreman] Does the record support his testimony?

Q. [ALJ] Yes, as to his mental limitations, the hallucinations.

A. [Dr. Foreman] He has periodically been delusional and, although you can (INAUDIBLE) that.  It's in the records.  There is also the diagnosis borderline personality disorder is, under periods of extreme stress, people with this diagnosis will show some psychotic behavior.  He has another problem in that, that he goes for long periods without psychotic behavior and as a – and, and, and he has a problem with compliance with medication.[9]

Although Dr. Foreman confirmed that Plaintiff had been delusional, he did not find that the record supported Plaintiff's testimony in its entirety.  Moreover, Dr. Foreman ultimately concluded that Plaintiff could perform simple, one-to-two step tasks with brief and superficial contact with others.  (Tr. 17, 1011).

Plaintiff also contends that Dr. Foreman should have had access to the psychiatric records submitted to the ALJ after the administrative hearing.  However, the records received after the hearing include treatment notes preceding the hearing and thus could have been provided to Dr. Foreman for review at the hearing.  (Tr. 944-55).  Moreover, there is no evidence the notes would have affected Dr. Foreman's opinion.  In fact, the notes show that Plaintiff benefitted from medication, denied problems or symptoms, and coped well with the death of his brother.  (Tr. 946-49, 951-55).

---

[9]  Plaintiff argues that the ALJ should have considered his inability to afford medication before discrediting him, but the ALJ did not discount his testimony on that basis.  (Doc. 19 at 5).  Rather, the ALJ noted that Plaintiff's pain and depression improved with medication.  (Tr. 20, 22).

Plaintiff also cites evidence submitted to the Appeals Council after the ALJ's decision. (Tr. 956-74). Because the Appeals Council refused Plaintiff's request to review the ALJ's unfavorable decision, the additional evidence cannot now be used as a basis for finding a reversible error. 42 U.S.C. § 405(g). Plaintiff has not presented an argument that the evidence is new and material so as to justify a sentence six remand. Even if the records did show Plaintiff's condition worsened, it would not warrant a sentence six remand. *Wyatt v. Sec. of Health & Human Servs.*, 974 F.2d 680, 685 (6th Cir. 1992) ("Evidence of a subsequent deterioration or change in condition after the administrative hearing is deemed immaterial.").

Moreover, "[t]he ALJ's assessment of credibility is entitled to great weight and deference, since he had the opportunity to observe the witness's demeanor." *Infantado v. Astrue*, 263 F. App'x 469, 475 (6th Cir. 2008). This deference extends to an ALJ's credibility determinations "with respect to [a claimant's] subjective complaints of pain." *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 652 (6th Cir. 2009).

In sum, the ALJ sufficiently articulated his reasoning in discounting Plaintiff's credibility. The evidence the ALJ relied upon constitutes substantial evidence supporting his credibility determination. Although Plaintiff points to other relevant factors that may support a different credibility finding, an ALJ's decision in this area is entitled to deference. Accordingly, the Court finds no error in the ALJ's assessment of Plaintiff's credibility concerning his complaints of pain.

**III.**

For the foregoing reasons, Plaintiff's assignments of error are unavailing.  The ALJ's decision is supported by substantial evidence and is affirmed.

**IT IS THEREFORE ORDERED THAT** the decision of the Commissioner, that Steven Quinn was not entitled to supplemental security income is found **SUPPORTED BY SUBSTANTIAL EVIDENCE**, and **AFFIRMED**; and, as no further matters remain pending for the Court's review, this case is **CLOSED**.


Date:  4/18/2013                    *s/Timothy S. Black*
                                   Timothy S. Black
                                   United States District Judge